EXECUTORS AND ADMINISTRATORS—COMMISSIONS—REALTY.
> Where an equitable conversion of realty has been effected by a power of sale in a will, and the estate is held by the executors, unconverted, they are not entitled to commissions on the principal, but the value of the realty may be considered, in determining the commissions to which they are entitled on the income.

Proceeding for the judicial settlement of the accounts of the executors of testator.

Estes, Barnard & Tiffany, for executors.
P. H. Vernon, for legatees.

FITZGERALD, S. An equitable conversion of the realty has been effected by the power of sale given by the will to the executors. The estate, however, is held by the executors as such, and the real estate being, as yet, unconverted, they are not entitled to commissions on the principal thereof. The value of the real estate, however, can be taken into consideration in ascertaining whether the value of the estate of decedent was $100,000 in excess of debts, for the purpose of determining the commissions to which the executors are entitled on income. The decree should provide for the retention of the estate by the executors, upon the trust in the will. There is insufficient evidence before the court upon which to decide the question as to the value of the real estate unsold, and I have referred the matter. Ordered accordingly.

---

(6 Misc. Rep. 570.)

### PARKS v. JACOB DOLD PACKING CO.

#### (Superior Court of Buffalo, General Term.  February 2, 1894.)

1. CONTRACTS—VALIDITY—VIOLATION OF INTERSTATE COMMERCE ACT.
> A contract to procure rebates from railroad companies for a shipper is void because it contemplates a violation of the interstate commerce act, (1 Supp. U. S. Rev. St. p. 529, § 2,) which declares that discrimination by carriers is thereby "prohibited and declared to be unlawful."

**2. SAME—CONSTRUCTION—ACTS OF PARTIES.**
　　Where a contract to procure rebates from railroad companies does not show on its face that rebates from railroads carrying freight outside the state in violation of the interstate commerce act were contemplated, evidence that such rebates were in fact procured is admissible to show the intent of the parties in making the contract.

**3. EVIDENCE—JUDICIAL NOTICE—LOCATION OF CITIES.**
　　Judicial notice will be taken of the geographical location of cities outside the state which generally are known as commercial centers.

**4. ACTION ON CONTRACT—AVERMENT OF ILLEGALITY—WHEN NOT NECESSARY.**
　　The rule that illegality of a contract sued on must be pleaded as a defense does not apply when the illegality appears from plaintiff's testimony.

Appeal from trial term.

Action by Hollis J. Parks against the Jacob Dold Packing Company. From a judgment entered on a decision directing a nonsuit and dismissing the complaint, and from an order denying a motion for a new trial, made on the minutes of the court, plaintiff appeals. Affirmed.

Argued before TITUS, C. J., and HATCH, J.

M. Filmore Brown, for appellant.

Sherman S. Rogers, for respondent.

HATCH, J. This action is brought to recover damages for a breach of contract of hiring. The plaintiff was the only witness sworn, and his testimony tended to establish that he entered into a verbal contract with the defendant whereby he agreed to render service for the defendant for the period of one year; that he entered upon said employment January 18, 1892, and continued to work thereunder until the 15th of March, 1893, when, without fault on his part, he was discharged by defendant. The only question presented upon this appeal relates to the validity of the contract of employment, the court below having held it void. The defendant carries on an extensive business in packing and shipping meats, and the services required of plaintiff related to the transportation department. Using plaintiff's language, the material part of the contract is found to be this:

"He [Dold] said that the position that we would create would be the transportation department, something he had never had before. He explained to me what he wanted me to do. He wanted me to handle all railroad matters, and work rebates with the railroad companies, and save him freight money. He said that he had been robbed by the railroad companies for about thirty years. * * * I was to get three thousand dollars for one year. * * * I had entire charge of the transportation department,—a position known as the 'general manager of the transportation department.' My work was to direct the routing of shipments, and working the different railroads to get the lowest possible rates, either openly or otherwise, and to save all the money in freights I possibly could, both in car lots and less than car lots."

On cross-examination plaintiff stated:

"My first talk with Mr. Dold * * * I told him in a casual way about my capacity to get freight rates below the tariff. I went to Mr. Dold's to handle the transportation department. That was to be my main business. The main feature of that business was getting freight rates properly adjusted, cutting them down low, get a lot of railroad companies, and get the best of them.

*   *   *   I was hired to take entire charge of the transportation department, whether it was below the tariff rate, to see that the cars came in promptly and that they went out promptly.   Every railroad has a right to carry at schedule rates.   I was to use my supposed ability to get special rates from the railroad companies.   I knew what the law was on the subject.   It has never been proved that it was a felony under the law to be getting cut rates. I knew to a certain extent that the statute made it a felony."

There is nothing left uncertain in the construction of this language or the contract or plaintiff's understanding of it, for he says its main feature was to cut freight rates, and get the best of railroad companies; and in its execution his testimony shows that he made arrangements with various railroad companies for the shipment of freight; that the defendant paid full tariff rates to the roads, and the latter paid to plaintiff a rebate, which he turned over to defendant, which amounted during the year of his employment to the sum of $5,285.06.   Plaintiff seems to have faithfully fulfilled his undertaking, stated at the beginning of his service,—that he would more than save his salary to his employer.   It seems unfortunate for him that a somewhat stringent statute hampers the complete exercise of his abilities, and cuts off the pecuniary emoluments derived therefrom.   The interstate commerce act, so called, provides, among other things, that every common carrier subject to the provisions of the act shall make, publish, and print a schedule of tariff charges for the transportation of freight and passengers, between the several states, which shall apply to all persons and corporations under similar conditions and circumstances.   Section 2 of said act provides:

"That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, draw-back, or other device charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property subject to the provisions of this act, than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."   1 Supp. Rev. St. U. S. p. 529.

It is argued that these provisions relate only to the common carrier, and not to the shipper; that at common law it was not against public policy to contract for shipment with rebate on freights, so it is now no offense for the shipper or his agent to induce the carrier to violate the law, in consequence of which the present contract is lawful in character and provides for meritorious service.   The case relied upon to support this construction (Root v. Railroad Co., 114 N. Y. 300, 21 N. E. 403) discredits it, for in that case the rebates provided for had consideration in the use of a coal pocket and docks, constructed by plaintiff's assignor, and it was held, taking all the circumstances into consideration, a question of fact whether such rebates constituted an unjust discrimination against other individuals to the injury of their business.   But the court says:

"Had this provision [for rebates] stood alone, unqualified by other provisions, without the circumstances under which it was executed, explaining the necessity therefor, we should be inclined to the opinion that it did provide for an unjust discrimination."

Whether the contract could be upheld at common law or not is of little consequence, for by section 10 of the interstate commerce act it is made a misdemeanor for the shipper or his agent to solicit or induce the carrier by any means to violate the provisions of the act by cutting the established tariff rate. 1 Supp. Rev. St. U. S. pp. 686, 687. Consequently, by its express terms, the act is made to apply to the plaintiff as though he were named in the prohibitive sections. Treating the act as malum prohibitum solely, defendant is not aided, for, as to the forbidden acts, the parties are in pari delicto, and each are subject to the penalties of the statute. Under such circumstances there can exist no enforceable contract. Tracy v. Talmage, 14 N. Y. 183–190; Knowlton v. Spring Co., 57 N. Y. 518. This contract is an entire one; no part is severable from the other. Its main object was to secure an unlawful preference in procuring freight reductions from established charges. This element was the one of value contemplated by the parties to it; and, as the service contemplated was illegal, and known by both parties to be so, the contract is equally so, and the law will not enforce it, or permit a recovery of damages based upon its violation. Jackson v. Walker, 5 Hill, 27; Foley v. Speir, 100 N. Y. 552–558, 3 N. E. 477; Pars. Cont. (8th Ed.) p. 456.

It is further said that there is nothing in the contract showing that it was the intention of the parties to secure rebates from regular schedule tariff rates of railroads carrying freight outside the state of New York. The rule is recognized that it is the duty of the court to give to the contract an innocent interpretation, when possible. Here the evidence excludes the interpretation contended for. The contract was to work railroads by securing a less rate than the schedule charge. In its performance the plaintiff states that on March 5, 1892, he "arranged with the Clover Leaf road, (the true name of the road is the Toledo, St. Louis & Kansas City road.) They were to pay me four dollars for each single deck of hogs and six dollars for each double deck of hogs from Kansas City to Buffalo. On March 15, 1892, I arranged with the same road to pay me seven and one-half cents per hundred pounds on dressed hogs in car lots from Wichita and Kansas City to Buffalo. That would vary from $15 to $20 a car." Kansas City and Wichita are large and universally known commercial centers in this country. The court will take judicial notice of their geographical location, and that transportation by railroad from these places is over lines outside the state of New York. Hunter v. Railroad Co., 116 N. Y. 615, 23 N. E. 9; Lanfear v. Mestier, 89 Amer. Dec. 658, note 678, 679; Pearce v. Langfit, 101 Pa. St. 507; The Peterhoff, Blatchf. Prize Cas. 521, 522. What was done by the parties under the contract may be resorted to for the purpose of aiding the interpretation; and the evidence in this case shows clearly that the railroads from which rebates were to be obtained were understood to embrace roads outside the state, and, as we have already seen, the contemplated reduction was to be less than the regular tariff schedule. It is therefore brought within the prohibitive terms of the interstate commerce act.

It is also contended that the answer does not allege that the contract is illegal, and therefore the question is not raised. But this rule does not apply when, from plaintiff's own testimony, the contract appears to be illegal. Honegger v. Wettstein, 94 N. Y. 260. It is quite apparent that the parties—plaintiff, at least—knew the service to be rendered was in violation of the interstate commerce act; that trouble would ensue if the details were known to federal authorities,—an apprehension which the evidence discloses was well founded. Under such circumstances, a clear case is presented for denying the relief asked for. The judgment and order appealed from are therefore affirmed, with costs.